**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| COREY A. MANN, | ) | CASE NO:    1:09-cv-2895 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | NANCY A. VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |

   Plaintiff, Corey Mann, challenges the final decision of Defendant, the

Commissioner of Social Security, Michael J. Astrue (the "Commissioner"), denying

Plaintiff's applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* (The "Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to the consent of the parties under the authority of 28

U.S.C. § 636(c)(2).

   For the reasons set forth below, the Court AFFIRMS the final decision of the

Commissioner.

1

## I.  PROCEDURAL HISTORY

On October 29, 2004, Plaintiff applied for POD, DIB, and SSI benefits.  (Tr. 88, 621.)  The applications alleged disability beginning August 14, 2003.  (Tr. 88, 621.)  These claims were denied initially, and upon reconsideration.  (Tr. 71, 75, 625, 629.)  On September 2, 2005, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 69.)

On December 6, 2007, a hearing was held before ALJ Peter Bronson.  (Tr. 636.)  Present with Plaintiff and his attorney were Bruce Holdread, a vocational expert ("VE"), and Hershel Goren, a medical expert ("ME").  (Tr. 636.)  The ALJ recognized that Plaintiff had protectively filed for SSI and DIB before, on October 22, 2003, and November 4, 2003, respectively.  (Tr. 18.)  Those prior applications also alleged disability beginning August 14, 2003.  (Tr. 18.)   Both applications were initially denied on June 21, 2004, and no further action was taken on them.  (Tr. 18.)  The ALJ reopened and revised the June 21, 2004, determinations on the prior applications because they were made less than one year before the applications presently before him.  (Tr. 18.)  The ALJ also recognized an amended disability onset date of September 21, 2003.  (Tr. 18, 641.)

On May 30, 2008, the ALJ found Plaintiff not disabled.  (Tr. 43.)  On November 6, 2009, the Appeals Council denied Plaintiff's request for review.  (Tr. 6.)  On December 15, 2009, Plaintiff timely filed a complaint to institute the present action.  (Doc. No. 1.)

Plaintiff claims the ALJ erred in two ways:  (1) by improperly discrediting Plaintiff's subjective claims of disability by unduly focusing on individual details of record evidence and not considering the Plaintiff as a "whole person"; and (2) failing to make

2

an appropriate conclusion at step five of his analysis because the Commissioner failed to meet his burden of proving the existence of sufficient work in the national economy that Plaintiff could perform.  (Pl.'s Br. at 12, 14.)  Therefore, Plaintiff seeks remand for further proceedings.  (Pl.'s Reply Br. at 2.)

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on May 6, 1963 (Tr. 40), and was 43 years old on the day of his hearing (Tr. 636).  At all times relevant to this inquiry, he was a "younger individual."  *See* 20 C.F.R. § 404.1563(c).  His past relevant work includes field service technician, field service supervisor, electromechanical installer, and area leader/supervisor of electronic production.  (Tr. 39.)  Plaintiff last worked in July or August 2003, and he was last insured for benefits on December 31, 2008.  (Tr. 86, 639, 641.)

### B.    Medical Evidence

#### 1.    Medical History for 2003

On September 21, 2003, Plaintiff fell and was taken to the emergency room.  (Tr. 154, 156.)  His admitting diagnoses by Dr. Allison Oppenheimer  were alcohol abuse, seizure disorder, meningitis, and a staph infection.  (Tr. 154.)  A CT scan and an MRI showed a subarachnoid hemorrhage and brain contusions.  (Tr. 154, 175, 177.)

On September 29, 2003, Dr. Adam Martin opined that Plaintiff was "moderately limited" in all basic physical capacities, and considered Plaintiff to be presently "unemployable."

In October, after his condition stabilized, Plaintiff was transferred to the

3

rehabilitation unit.  (Tr. 154.)  Upon discharge to the rehabilitation unit, Dr. Oppenheimer

noted that Plaintiff's duration of disability was one year.  (Tr. 155.)

Attending physician Dr. Usharani Tandra saw Plaintiff in the rehabilitation unit

and diagnosed moderately severe traumatic brain injury with subarachnoid and

subdural hemorrhages, and brain contusions.  (Tr. 199.)  Plaintiff reported a

twenty-five-year history of alcohol abuse.  (Tr. 197.)  Dr. Tandra opined that Plaintiff had

limitations in his activities of daily living as well as impaired ambulation and cognition.

(Tr. 199.)  Plaintiff received physical, occupational, and speech therapy.  (Tr. 192, 199.)

After roughly two weeks, he was discharged at a daily supervision level, having

tolerated all therapies well.  (Tr. 219.)

Dr. Harsh Govil also saw Plaintiff in the rehabilitation unit and opined that Plaintiff

was unemployable due to his high blood pressure, alcohol abuse, seizures, and status

post-fall with subarachnoid hemorrhage (Tr. 152), even though he found that Plaintiff

had only "not-significant" or "moderate" limitations (Tr. 151).[1]

### 2.    Medical History for 2004

In January, a mid-back x-ray of Plaintiff's back showed "probably old"

compression deformities at two levels.  (Tr. 227.)  A CT scan at the same time revealed

no acute changes in the back.  (Tr. 228.)

In March, consulting psychologist Dr. Mitchell Wax examined Plaintiff.  (Tr. 230.)

Plaintiff reported a thirty-five-year history of alcohol use, and reported not drinking since

---

[1]    The report by Dr. Goval is undated, but contains a time-stamped facsimile
date of October 23, 2003.  (Tr. 151-52.)  Moreover, Dr. Goval was listed
as a resident physician in the rehabilitation unit where Plaintiff was
admitted in October 2003.  (Tr. 191.)

September 2003; Dr. Wax, however, suspected "malingering . . . as [Plaintiff] smelled of alcohol during [the] evaluation (alcoholism suspected)."  (Tr. 231.)  Dr. Wax also noted that Plaintiff was evasive about how he spent his days.  (Tr. 233.)  Dr. Wax diagnosed Plaintiff with dementia due to seizure disorder and brain trauma, and alcohol dependence.  (Tr. 234.)  Dr. Wax assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 61,[2] indicating that Plaintiff was "mildly depressed because of his memory problems . . . has meaningful . . . relationships with his mother and girlfriend," and "is able to do household chores and . . . fix household appliances."  (Tr. 235.)  Dr. Wax opined that Plaintiff had a moderate impairment in his ability to relate to others; a mild impairment in his ability to understand, remember and follow instructions; a moderate impairment in his ability to maintain attention, concentration and persistence; and a moderate impairment in his ability to withstand the stress of daily work.  (Tr. 234.) Dr. Wax concluded that Plaintiff had "good mental ability to perform simple repetitive tasks, but does them slowly."  (Tr. 234.)

Also in March, state agency psychologist Dr. Bruce Goldsmith opined that Plaintiff had a mild limitation in his social functioning and moderate limitations in both his activities of daily living and his ability to maintain concentration, persistence or pace. (Tr. 237-47.)  He concluded that Plaintiff was able to perform one- to two-step tasks, but

---

[2]     A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See* Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th ed. revised, 2000).

would have difficulty with more detailed tasks.  (Tr. 251.)  He also concluded that Plaintiff would be able to perform limited work activities not requiring strict production quotas or pressures to perform rapidly.  (Tr. 251.)

A mid-back x-ray in March showed a new compression fracture in one vertebrae with fifty-percent loss of height when compared to the 2003 x-ray, as well as new, but minimal, height loss in another vertebrae.  (Tr. 258.)

In April, Plaintiff saw Dr. Jeffrey Rosenberg with complaints of back and rib pain. (Tr. 252-53.)  Plaintiff also saw neurologist Dr. Marc Winkelman that month and reported sobriety as of October 2003.  (Tr. 254-55.)  Dr. Winkelman found that Plaintiff's gait and coordination were "ok," noted that it was "unclear" if Plaintiff was having seizures, and restricted him from driving.  (Tr. 256.)  Plaintiff was on a variety of medication at that time.  (Tr. 252, 254.)

In May, Dr. Alok Bhaiji examined Plaintiff in connection with Plaintiff's application for Social Security benefits.  (Tr. 260.)  Plaintiff reported that he had suffered a seizure in January while off his medication, and that he suffered two fractured vertebrae as a result.  (Tr. 260.)  A lower back x-ray showed mild degenerative changes and marked narrowing of the disc space at one level.  (Tr. 267.)  After a normal physical examination, Dr. Bhaiji concluded that Plaintiff had no difficulty with sitting or standing but might have unspecified difficulty with speaking, traveling, walking, lifting, and carrying and handling objects.  (Tr. 262-66.)  He added that a seizure could affect any such activities.  (Tr. 262.)

In June, an unidentified state agency physician opined that Plaintiff had no exertional, postural, manipulative, visual or communicative limitations.  (Tr. 268-77.)

6

Still, the physician felt that Plaintiff should not work around hazards.  (Tr. 271-72.)

In July, Plaintiff saw chiropractor Dr. James Bedocs with a complaint of rib pain on his right side, and difficulty breathing.  (Tr. 312.)  Plaintiff's physical examination was normal, indicating only some reduced range of motion in his lower back.  (Tr. 312-13.) Plaintiff saw Dr. Bedocs regularly from July through September, and then again in December.  (Tr. 314-18.)

Plaintiff saw Dr. Daniel Holden in December for osteoporosis treatment.  (Tr. 302.)  Dr. Holden recommended medication, exercise, and stretching.  (Tr. 302.)

### 3.    Medical History for 2005

In January and through March, Plaintiff saw Dr. Bedocs again.  (Tr. 318-19.) Plaintiff also saw Dr. Winkelman, again, in January.  (Tr. 324.)  Dr. Winkelman reported Plaintiff as doing "ok," with no seizures.  (Tr. 324.)  The doctor noted, however, that Plaintiff's girlfriend reported that Plaintiff "gets goofy," "acts drunk," and "argues a lot." (Tr. 324.)  Plaintiff alleged lower back pain, but he rated it at one out of ten in intensity. (Tr. 325-26.)

Also in January, state agency physician Dr. Jerry McCloud gave his opinion on Plaintiff's functionality.  (Tr. 303-10.)  He felt that Plaintiff had no exertional limitations; could never balance; could frequently kneel, crouch and crawl; and had to avoid exposure to hazards, including a ban on driving.  (Tr. 303-10.)

In May, two CT scans of Plaintiff's brain showed small, evolving areas of encephalomalacia related to remote trauma, but the scans were otherwise unremarkable.  (Tr. 396, 438.)  A neck x-ray showed minimal, mild narrowing of one disc.  (Tr. 437.)

7

In June, state agency physician Dr. Teresita Cruz affirmed Dr. McCloud's opinion.  (Tr. 310.)  Also that month, consulting psychologist Dr. Thomas Zeck examined Plaintiff in connection with Plaintiff's application for benefits.  (Tr. 329.)  Dr. Zeck diagnosed Plaintiff with depressive disorder and alcohol dependence in remission. (Tr. 334.)  He also assigned Plaintiff a GAF score of 55.[3]  (Tr. 334.)  Dr. Zeck opined that Plaintiff had no impairment in his ability to understand, remember and follow instructions; a mild impairment in his ability to relate to others; and a moderate impairment in his ability to withstand the stress of daily work.  (Tr. 335.)  Dr. Zeck also felt that Plaintiff had no impairment in his ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks if they did not "involve a great deal of physical exertion."  (Tr. 335.)

In June, state agency psychologist Dr. Alice Chambly indicated that Plaintiff had mild limitations in his activities of daily living; moderate limitations in his social functioning; and moderate limitations in maintaining concentration, persistence or pace. (Tr. 335A-45.)  She concluded that Plaintiff could do "tasks which do not involve complex and multifaceted instructions."  (Tr. 349.)  She also indicated that Plaintiff was "moderately limited" in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 348.)

_____

[3]      A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See* Diagnostic and Statistical Manual of Mental Disorders, *supra* note 2.

In July, Plaintiff reported two seizures after an increase in his seizure medication dosage.  (Tr. 389.)  An EEG in August, however, was normal.  (Tr. 386-87.)

In September, Plaintiff complained of back pain, but also said it was relieved by over-the-counter pain medication.  (Tr. 382.)  On examination, Plaintiff had back tenderness and significantly limited range of motion, but normal strength and sensation.  (Tr. 382.)  Plaintiff also reported two to three seizures monthly.  (Tr. 382.)  Back x-rays that same month showed essentially no changes when compared to the films from March 2004.  (Tr. 381.)

In October, Dr. Winkelman noted that Plaintiff had been seizure-free since starting new medication.  (Tr. 378-80.)  A back MRI that month, reviewed by Dr. Guang Yang, showed only the prior compression fractures.  (Tr. 377.)  Plaintiff also reported to Dr. Yang minimal back pain.  (Tr. 374.)  An x-ray of the back showed no changes when compared to the September x-rays.  (Tr. 371.)

### 4.	Medical History for 2006

In April, Plaintiff reported no seizures since the summer of 2005.  (Tr. 363.) In June, Plaintiff was admitted to the hospital after a seizure caused by excessive medication.  (Tr. 415-16, 495.)  A CT scan of Plaintiff's brain was normal, and an EEG was indeterminate but showed no indication of ongoing seizures.  (Tr. 427-28.)  Plaintiff was given medication and released roughly one week later.  (Tr. 404, 416-18.)

In July, Plaintiff reported back pain at five out of ten on an intensity scale, and said he could stand and walk for one hour each, and sit for thirty minutes.  (Tr. 490.)  That same day, he had a steroid injection in his back.  (Tr. 487-88.)  In August, he had another steroid injection in his back.  (Tr. 481.)

9

In November, Plaintiff had facet injections.  (Tr. 470.)  That same month, Dr. Hani Helmi noted that Plaintiff's pain was limited to his mid-back region, but opined that he had "significant limitations" secondary to his back pain, mild traumatic brain injury, and a history of seizures.  (Tr. 467-68.)  He further opined that finding gainful employment "will prove challenging," and Plaintiff should be "seriously considered for disability."  (Tr. 467.)

### 5.    Medical History for 2007

In July, Plaintiff was diagnosed with, and treated for, diverticulitis.  (Tr. 509, 565-69, 579.)  In August, Plaintiff had nerve injections in his mid-back.  (Tr. 517-18.)  A CT scan that month showed no change in Plaintiff's mid-back when compared to the December 2005 images.  (Tr. 521.)  Still, Plaintiff stated that he could stand and sit for only twenty minutes each and walk for about thirty minutes.  (Tr. 528.)  He rated his pain at five out of ten on an intensity scale and denied suffering depression.  (Tr. 528.)  His clinical examination was normal, save for pain on examination of his back.  (Tr. 530.)  In September, Plaintiff alleged weekly anxiety attacks.  (Tr. 501.)  In November, Plaintiff had an epidural injection in his mid-back.  (Tr. 604.)

### 6.    Medical History for 2008

In January, Plaintiff saw pain medication and rehabilitation specialist Dr. Michael Harris.  (Tr. 609.)  A physical examination was largely normal, save for tenderness and limited range of motion in the back.  (Tr. 612.)  Dr. Harris nonetheless opined that Plaintiff was "not capable of gainful employment."  (Tr. 612.)  He repeated Plaintiff's allegations that he could not lift more than about five pounds (Tr. 610, 613), and stated that Plaintiff could not sit or stand for more than ten minutes without changing positions

10

(Tr. 613).

C.    **Hearing Testimony**

1.    **Plaintiff**

Plaintiff testified that he believed he was disabled because he suffered a brain injury that required therapy, and then suffered seizures and two compression fractures in his back, which made his "mobility and strength and stamina . . . pretty much non-existent." (Tr. 639-40.)  Plaintiff testified that his back injury limited him "very much." (Tr. 657.)  He claimed that he would need to rest for twenty minutes to a half-hour after showering in the morning.  (Tr. 658.)  He claimed that he was "done for the day" after showering, walking across the street to the grocery store, and carrying groceries home. (Tr. 658.)  He claimed that he was generally confined to his recliner chair, and that he left the house only when "absolutely necessary."  (Tr. 658.)

Plaintiff inconsistently testified about his alcohol use, stating that he had not had a drink since his brain injury, then since July 2007, then August 2007, and then September 2007.  (Tr. 640, 642.)

2.    **Medical Expert**

The ME testified that he was a neurologist.  (Tr. 643.)  He indicated that when Plaintiff had a seizure in May 2005, his blood alcohol level was elevated and his blood work showed no traces of the prescribed anti-seizure medication.  (Tr. 644.)  He also testified that fractures of the thoracic vertebrae, which Plaintiff suffers, do not cause impairment and normally only cause pain that lasts a couple of weeks.  (Tr. 645 660-61.)  He said the record indicated symptoms of back pain and related treatment, but that those conditions did not amount to a severe impairment.  (Tr. 648.)  He did not think

11

Plaintiff's treatment for back pain would interfere with a normal work schedule.  (Tr. 648.)

The ME testified that Plaintiff's impairments, considered individually and in combination, did not meet or equal any Listed Impairments.  (Tr. 647.)  He testified that, although Plaintiff's seizures were significant when they occurred, they did not occur with sufficient regularity to meet the listings.  (Tr. 647.)  He testified further that, although Plaintiff had an organic mental impairment, which falls under 12.02, and depression, which falls under 12.04, none of his symptoms reached the level of severity required by the listings.  (Tr. 645-47.)  And, although Plaintiff's history of alcohol abuse would be viewed under 12.09, the ME believed Plaintiff's condition did not meet that listing, either.  (Tr. 646-47.)

The ME testified that Plaintiff's activities of daily living were mildly decreased, that he had moderate difficulties in maintaining social functioning; moderate difficulties with concentration, persistence or pace; and no episodes of decompensation.  (Tr. 646.)  He testified that Plaintiff had no exertional restrictions, but that he should never use a ladder, rope or scaffold, moving machinery, and unprotected heights, and should not drive.  (Tr. 647.)  He also felt that Plaintiff should have no high production quotas and only superficial inter-personal interactions with supervisors, co-workers and the general public (specifically excluding arbitration, negotiation, confrontation, and supervision of others).  (Tr. 648.)

When questioned about absenteeism, the ME testified that there was no medical reason for Plaintiff to suffer excessive absenteeism unless he were drinking.  (Tr. 648).  In conclusion, the ME remarked that, "from the information we've got, I think [Plaintiff]

could remain on task and function full time in a work environment."  (Tr. 655.)

### 3.    Vocational Expert

The VE testified in response to three hypothetical questions from the ALJ.  (Tr. 668-70.)  The first hypothetical posed a person with Plaintiff's vocational profile who cannot climb ladders, ropes or scaffolds; cannot work in proximity to moving machinery, unprotected heights, or other hazards; cannot operate a motor vehicle as part of a job; is limited to doing simple work only and following simple instructions only; is limited to low stress work only; cannot adhere to strict production quotas or do assembly line work, or piece rate work; cannot perform negotiation, confrontation, arbitration, or other intense interpersonal interactions with the public, co-workers, or supervisors; cannot supervise or manage other people; and cannot be responsible for the health, safety, or welfare of other people.  (Tr. 668.)  The VE testified that such a person could not perform Plaintiff's past relevant work.  (Tr. 668.)  The VE testified to three jobs in the national economy that such a person could perform:  cleaner, automobile detailer, and dining room attendant.  (Tr. 669.)

The second hypothetical from the ALJ was the same as the first, but added one more limitation:  an at-will sit/stand option.  (Tr. 669.)  The VE testified that none of the previous three jobs would be suitable for such a person.  (Tr. 670.)  The VE testified that such a person under hypothetical number two could perform three sedentary jobs:  food and beverage order clerk, addresser, and document preparer.  (Tr. 670.)

The third hypothetical was the same as the second, but added one more limitation:  absence from work on average at least once per week because of said impairments.  (Tr. 670.)  The VE testified that there would be no jobs available for such

a hypothetical person in the local, state, or national economy.  (Tr. 670.)

When questioned about whether Plaintiff would suffer very close supervision at any possible jobs for which he were qualified, the VE (1) testified that it was unlikely that Plaintiff would suffer very close supervision in any of the proposed jobs (Tr. 672-73), but (2) agreed that "we don't really know in how many of [the jobs] there would be a confrontational supervisor" (Tr. 673).

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).   A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that

14

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. Mr. Mann fisrt met the insured status requirements of the Social Security Act on July 1, 1998, and continues to meet them through, but not after, December 31, 2008.

2. Mr. Mann has not engaged in substantial gainful activity at any time from September 21, 2003, the amended alleged onset date, through the date of this decision.

3. From September 21, 2003, the amended alleged onset date, through the date of this decision, Mr. Mann had and has each of the following impairments, each of which was and is a "severe impairment":

Seizure disorder[;]

Organic mental impairment secondary to a fall that was secondary to the seizure disorder and that occurred on September 21, 2003, resulting in subarachnoid

15

hemorrhage, left subdural hematoma, and right frontal temporal contusions that later became encephalomalacia in the right frontal and temporal lobes[;]

Compression fractures of the vertabrae in the thoracic spine at T9 and T11 secondary to a fall that was secondary to the seizure disorder and that occurred on January 10, 2004[;]

Depression[,]

Alcohol abuse[;]

Roseacea and aesteototic eczema[;]

Proptosis secondary to maxillary hypoplasia of OU (also known as degenerative disease of the eyelid and / or keratoconjunctivitis)[;]

Diverticulitis[; and]

Toe amputations.

4.      From September 21, 2003, the amended alleged onset date, through the date of this decision, Mr. Mann did not and does not have an impairment or combination of impairments that met, meets, medically equaled, or medically equals the criteria for any of the Listed Impairments in the Listing of Impairments.

5.      After careful consideration of the entire record, I find that, from September 21, 2003, the amended alleged onset date, through the date of this decision, Mr. Mann had and has the residual functional capacity to perform work activities except for the following limits on Mr. Mann's ability to work:   [See VE's hypothetical questions one and two, *supra* Part II.C.3]

6.      Mr. Mann is unable to perform any past relevant work.

. . .

9.      Mr. Mann has at least a high school education and is

16

         able to communicate in English . . . .  Mr. Mann's education did not provide for direct entry into skilled work.

10.     Mr. Mann's job skills are not transferable to any job that Mr. Mann can do consistent with the residual functional capacity stated . . . above.

11.     From September 21, 2003, the amended alleged onset date, through the date of this decision, considering all of Mr. Mann's impairments, and considering Mr. Mann's age, education, work experience, and residual functional capacity, there were and are jobs that exist in significant numbers in the national economy that he could and can perform.

12.     Mr. Mann has not be under disability, as defined in the Social Security Act, from September 21, 2003, the amended alleged onset date, through the date of this decision.

(Tr. 20-42.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court "do[es] not review the evidence *de novo*, make credibility determinations nor weigh the evidence."  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

"The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brainard*, 889 F.2d at 681.

**B.      Substantial Evidence Supports the ALJ's Decision.**

Plaintiff argues that his "complaints of pain, his frequency of treatment, his medication list, all combine to afford credibility [to Plaintiff's claim of disability] where the ALJ found no credibility by looking at each item [of evidence] individually." (Pl.'s Br. at 14.) Plaintiff does not argue that the ALJ made improper credibility assessments of other, individual pieces of evidence; rather, he argues that the ALJ erred by failing to give Plaintiff's testimony more credibility in light of "the entire picture." (Pl.'s Br. at 14.) Plaintiff would like the Court to "look[] at [Plaintiff] globally, listen[] to him talk, observ[e] the way he moved, and understand[] how he responded to questions, as a whole person," to find that the ALJ erred in his determination that Plaintiff is not disabled. (*See* Pl.'s Br. at 13.) This asks the Court to apply an improper standard of review. The Court's review is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact, and whether the correct legal standards were applied. *Ealy*, 594 F.3d at 512.

Failing to consider Plaintiff "as a whole person" is not a recognizable legal standard under social security law. However, Plaintiff's argument implicates two

18

requirements of an ALJ:  basing his findings on the record as a whole, and making proper credibility assessments of the record evidence.  *See* C.F.R § 404.1529; C.F.R § 416.929.  Plaintiff's argument will be considered under these standards.

Disability is determined by considering all of a claimant's alleged symptoms, "including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  C.F.R. § 404.1529(a); C.F.R. § 416.929(a).  Alleged symptoms "will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  C.F.R. § 404.1529(b); C.F.R. § 416.929(b).  If the adjudicator finds that a claimant has a medically determinable impairment "that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the adjudicator "must then evaluate the intensity and persistence of [the claimant's] symptoms," to determine how they limit the claimant's capacity for work.  C.F.R. § 404.1529(c)(1); C.F.R. § 416.929(c)(1).  The adjudicator considers "all of the available evidence," when evaluating the intensity and persistence of the alleged symptoms.  *Id.*

A claimant's description of his physical or mental impairments, alone, is "not enough to establish the existence of a physical or mental impairment."  C.F.R. § 404.1528(a); C.F.R. § 416.929(a).  However, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  S.S.R. 96-7p(4); *accord* C.F.R. §404.1529(c)(2); C.F.R. § 416.929(c)(2).

19

In all cases, credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See* *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  An ALJ may consider both a claimant's credibility and household activities in evaluating complaints of disabling pain.  *See* *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See* *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  But, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so."  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

Here, the ALJ extensively and meticulously explained his assessments of the medical opinions in Plaintiff's record (*See* Tr. 31-38), which Plaintiff does not contest (Pl.'s Br. at 14).  And the ALJ clearly stated why he found Plaintiff's subjective claims of an inability to work not credible:  (1) Plaintiff's testimony about his frequency of alcohol use was inconsistent (Tr. 30); (2) Although Plaintiff reported using alcohol for thirty-five years, he also reported having worked during that time with "no problems understanding what was expected of him at work, with the quality of his work, with his attendance, or with supervisors or co-workers" (Tr. 30-31); (3) Plaintiff testified to being able to do household chores, take basic hygienic care of himself, and fix household appliances (Tr. 31); (4) the record did not support Plaintiff's mother's claim that Plaintiff suffered spinal stenosis (Tr. 31); and (5) Plaintiff's subjective claims were discredited because they were inconsistent with the aggregate analysis of the medical opinions in the record (Tr. 31-38).

All that remains necessary to support the ALJ's decision is the presence of substantial evidence in the record.  The court finds that the ME's testimony, upon which the ALJ relied, constituted substantial evidence to support the ALJ's decision.

An ME may offer his own opinion regarding a claimant's condition to make complex medical cases understandable to the layman examiner.  *See* 20 C.F.R. § 416.927(f)(2); *Richardson v. Perales*, 402 U.S. 389, 408 (1971).  The ALJ may properly rely on a non-examining ME's testimony to make sense of the record.  *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001).  An ALJ's reliance on a non-examining ME's opinion is proper if the expert's opinion is based on objective reports and opinions.  *See Barker v. Shalala*, 40 F.3d 789, 794-95 (6th Cir. 1994); *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1308-09 (6th Cir. 2001).  An ME's testimony, which is consistent with the evidence of record, represents substantial evidence to support the ALJ's decision.  *See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989).

Here, the ME summarized the medical evidence of Plaintiff's condition:  "Activities of daily living are mildly decreased; moderate difficulties maintaining social functioning; moderate difficulties with concentration, persistence, or pace; no episodes of decompensation."  (Tr. 646.)  And the ME testified that Plaintiff's alleged back pain was not supported by the medical evidence.  For example, the ME testified that "compression fractures of the thoracic vertebra," of which Plaintiff suffered, "do not cause prolonged pain."  (Tr. 661.)  The ME opined that Dr. Bahji's opinions of Plaintiff's functional restrictions were not supported by Dr. Bahji's overall evaluation of Plaintiff,

which was "normal."  (Tr. 659.)  And the ME was not able to tell from Dr. Yang's

evaluation why Dr. Yang believed Plaintiff should be "temporarily totally disabled" when

that belief was not supported with any explanation, and was contradicted by Dr. Yang's

finding of only "mild pain" in Plaintiff's mid and lower back.  (Tr. 661, *citing* Tr. 382.)  In

sum, the ME opined that, "From the information we've got, I think [Plaintiff] could remain

on task and function full time in a work environment."  (Tr. 655.)

The ME's testimony was made in light of unsubstantiated or contradictory medical

reports in the record.  For example, although Dr. Martin found Plaintiff's abilities to sit,

stand, and walk were affected, he did not describe to what extent.  (Tr. 31, *citing* Tr.

150.)  The ALJ gave no weight to Dr. Martin's conclusion that Plaintiff was

"unemployable" because that conclusion was inconsistent with the doctor's separate

conclusion that all of Plaintiff's limitations were expected to last "less than 30 days," and

because employability is a determination reserved for the Commissioner.  (Tr. 31.)

Although Dr. Govil's noted that Plaintiff was "unemployable" (Tr. 31, *citing* Tr.

152), the ALJ discredited that finding because it was inconsistent with Dr. Govil's

separate conclusion that Plaintiff was, at most, only "moderately limited" (Tr. 151), and

because employability is a determination reserved for the Commissioner (Tr. 32).

The ALJ also considered Dr. Harris's following opinion of Plaintiff's condition:

> I do not believe that Mr. Mann is capable of gainful
> employment.  He cannot sit or stand for more than about 10 to
> 15 minutes without changing positions and would not manage
> an 8-hour workday.  He cannot lift more than about 5 pounds.
> He should be considered for permanent total Disability [sic].

(Tr. 32, *citing* Tr. 612-13.)  The ALJ discredited this opinion, however, because it was

based on Plaintiff's own statements of his condition, "not on Dr. Harris's own

22

independent testing and evaluation of [Plaintiff's] abilities to lift, carry, and do other work-related activities."  (Tr. 32.)  Nor did the ALJ find Dr. Harris's opinions consistent with, or supported by, what Dr. Harris observed when he examined Plaintiff:  "His neurological exam including strength, sensation, and reflexes are normal."  (Tr. 32-33, *quoting* Tr. 612.)

Because the ALJ's based his decision on the record as a whole, explained his credibility determinations, and relied on an ME whose opinions were consistent with the evidence of record,  the Court finds that there is substantial evidence to support the ALJ's decision.

### C.    The ALJ Did Not Make an Improper Conclusion at Step Five of His Analysis.

At the fifth and final step of an ALJ's analysis, the ALJ must determine whether, in light of the claimant's residual functional capacity, age, education, and past work experience,  the claimant can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  At this step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  If the Commissioner satisfies this burden, the claimant will be found not disabled.  C.F.R. § 404.1520(g)(1).

"To meet this burden, there must be a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Workman*, 105 F. App'x at 799 (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)) (internal quotes omitted).  "Substantial evidence may be produced

23

through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments."  *Workman*, 105 F. App'x at 799 (quoting *Varley*, 820 F.2d at 779).

Plaintiff argues that the Commissioner failed to meet his burden at step five because the ALJ "failed to acknowledge that an individual who had moderate limitations in the ability to complete a normal workday and workweek, and who had no ability to function under close supervision was capable of performing any jobs that exist in any significant numbers in the national and regional economies."  (Pl.'s Br. at 16.)  The Court finds Plaintiff's argument unpersuasive.

### 1.    The ALJ Acknowledged Plaintiff's Limitations in the Ability to Complete a Normal Workday and Workweek.

The ALJ included absenteeism as a limitation in his third hypothetical question to the VE (Tr. 670), but, after the VE's testimony, concluded that such a limitation lacked support from the record (Tr. 674-75).  Indeed, the ME testified that Plaintiff would not suffer absenteeism unless he were drinking alcohol (Tr. 648), and concluded that "from the information we've got, I think [Plaintiff] could remain on task and function full time in a work environment" (Tr. 655).

Ultimately, the ALJ did not include absenteeism in Plaintiff's residual functional capacity.  (Tr. 26-27.)  The ALJ relied on the ME's testimony in making this decision.  (Tr. 37, 38.)  The ALJ concluded that, if alcohol abuse were factored into his analysis, and Plaintiff were reassessed based on a cessation of alcoholism pursuant to C.F.R. §§ 404.1535 and 416.935, Plaintiff would have the same residual functional capacity as

24

previously determined.  (Tr. 38.)  Indeed, the ALJ recognized that, notwithstanding Plaintiff's claims that he had been drinking alcohol for thirty-five years, he had worked throughout that time with "no problems understanding what was expected of him at work, with the quality of his work, with his attendance, or with supervisors or co-workers."  (Tr. 30-31.)  The ME's testimony, as well as other evidence of record, provide substantial evidence supporting the ALJ's determination that Plaintiff was not limited by absenteeism.  *See Atterberry*, 871 F.2d at 570.

The second hypothetical question that the ALJ posed to the VE accurately portrayed Plaintiff's limitations because it was based on substantial evidence.  The ALJ relied on the VE's testimony regarding the second hypothetical question to make his decision.  The VE's testimony is substantial evidence supporting the ALJ's decision because it was based on a hypothetical question that accurately portrayed Plaintiff's limitations.  *See Workman*, 105 F. App'x at 799 (citing *Varley*, 820 F.2d at 779). Therefore, the Commissioner met his burden, and the ALJ made a proper conclusion, at step five of the ALJ's analysis.  *Id.*

### 2. The ALJ Acknowledged Plaintiff's Limitation Regarding Close Supervision.

The ALJ found Plaintiff's residual functional capacity limited such that Plaintiff "could not and cannot do work involving . . . *intense* interpersonal interactions with . . . supervisors."  (Tr. 27) (emphasis added).  Plaintiff notes that (1) "[n]o mental health professional felt that [Plaintiff] would always be on task," and (2) the VE could not say for certain what kind of supervisory style any future, hypothetical managers might implement with Plaintiff.  (Pl.'s Br. at 15.)  Plaintiff argues in conclusion that, because the

VE could not *guarantee* that any of the jobs that the VE proffered would *never* involve very close supervision, there was insufficient evidence to prove Plaintiff could work at a significant number of jobs in the national economy that meet Plaintiff's limitations.  (Pl.'s Br. at 15-16.)  The Court disagrees.

The VE is charged with providing testimony about the characteristics and requirements of specific jobs; he is not expected to guarantee the behavior of hypothetical supervisory personnel.  *Cf. Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("The vocational expert's testimony is directed solely to whether . . . there exist a significant number of employment opportunities . . . in the regional and national economies."); C.F.R. § 404.1566(c) (providing that a claimant will not be disabled if his RFC and vocational abilities make it possible for him to do work that exists in the national economy, even if the claimant remains unemployed because of, among other reasons, the hiring practices of individual employers).

The ALJ's hypothetical questions to the VE accurately portrayed Plaintiff's limitations, including his limited ability to engage in intense interpersonal interactions with supervisors.  (Tr. 667-68.)  Moreover, the VE testified that it was unlikely that Plaintiff would suffer very close supervision in any of the jobs that the VE offered.  (Tr. 672-73.)  Therefore, the VE's testimony regarding the existence of a significant number of jobs in the national economy constitutes substantial evidence supporting the ALJ's decision.  *See Workman*, 105 F. App'x at 799 (citing *Varley*, 820 F.2d at 779).

## VI.    CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED, and judgment is entered in favor of Defendant.

IT IS SO ORDERED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: September 3, 2010